# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1280

_____

Phillip David Schaub,

        Appellee,

v.

Steven VonWald,

        Appellant.

\*   Appeal from the United States
\*   District Court for the
\*   District of Minnesota.

_____

Submitted:  November 17, 2010
Filed: April 26, 2011

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

After a bench trial, the district court[1] found that Steven C. VonWald, the director of the Minnesota facility in which Philip D. Schaub was incarcerated, was deliberately indifferent to Schaub's serious medical needs in violation of the Eighth Amendment.  The court awarded Schaub $214,000 in compensatory damages and $750,000 in punitive damages.  VonWald appeals both the judgment and the award of punitive damages.  Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

_____

[1] The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, now retired.

I.

In 1984, Schaub became a paraplegic at age 21 in a car accident. On November 20, 2002, Schaub pled guilty before Minnesota District Judge Jodi L. Williamson, and was sentenced to serve 180 days in the Olmsted County Adult Detention Center ("ADC") as part of his sentence. The ADC is a detention facility connected to the County Government Center in Rochester, Minnesota. At the time of Schaub's confinement, the ADC director was VonWald.

Schaub has several serious medical conditions. Due to the atrophy of his muscles from the chest down, he has very little cushion in his legs and buttocks to protect his feet, legs, coccyx (tail bone), and sacrum (lower back), which easily become bruised or affected by pressure sores. Pressure (bed) sores are lesions caused by unrelieved compression of tissues between bone and surrounding surfaces. Bed sores are slow-healing and can be fatal if untreated. Proper treatment is to relieve pressure by turning the patient at least every two hours, and keeping the wounds free of bacteria and dead tissue (because bacteria grow in dead tissue and can greatly compromise wound healing). Schaub also has edema (an abnormal accumulation of fluid beneath the skin) in his feet, which creates pressure that can exacerbate any bed sores. Treatment requires him to elevate his feet above his head at night in order to drain excess fluid.

Schaub also suffers from severe spasticity—involuntary muscle contractions that cause lower-body muscles to jump and jerk. Because he has sensation down to his knees, his spasticity causes pain and interferes with sleep. The spasticity, which prevents Schaub from sleeping completely flat, is treated by elevating both his legs and upper body with the aid of an adjustable hospital bed. In addition, he has an intrathecal pump under his skin that administers the drug baclofen directly into his cerebral spinal fluid (baclofen dampens the spasticity).

When Schaub came to the ADC in March 2003 to begin his sentence, he was assigned to a handicapped-accessible cell in the work-release unit. In work release, detainees work outside the ADC at regular jobs during business hours, then return for overnight detention. For full-time prisoners, the ADC contracts with the local public health department to staff the ADC medical unit and provide health-care services. Detainees on work release, however, are responsible for their own medical care and may obtain medical care while away from the ADC. Both full-time and work-release detainees are sent to an outside hospital for emergency care. During Schaub's stay, the medical unit was staffed by nurses during business hours Monday through Friday. A part-time physician was supposed to be present for a half-day twice a week. The medical staff was supervised by Robin G. Molella, M.D., a Mayo Clinic physician working under a contract between the county and the clinic.

Schaub's handicapped-accessible cell had a privacy wall adjoining the toilet. The toilet had grab bars nearby at an angle, neither horizontal nor vertical. The cell had an emergency call button near the bed, not reachable from the toilet. Immediately upon entering the cell at intake, Schaub notified the sergeant that the cell was inadequate for his needs. Schaub said the toilet was so low that he could fall when transferring between it and his wheelchair, and the shower was unusable because the shower bench was made of hard metal. He also objected to the metal bed common to all ADC cells, which could cause pressure sores.

The sergeant attempted to accommodate Schaub. He was authorized to take an additional two hours of work-release time to go home to shower and use the bathroom (Schaub's apartment had a shower with a padded seat and hand-held showerhead, and the toilet had a padded seat). The sergeant authorized two mattresses and additional pillows for Schaub's bed.

A short time after arriving, Schaub developed pressure sores on his legs; the additional pillows were insufficient to raise his legs high enough to drain fluids out

-3-

of them.[2]  Compounding the problem, the bed had no grab bars, so he could not change his body position in order to prevent pressure sores.

During his time at the ADC, Schaub continued to see his regular doctors at the Mayo Clinic while on work release.  On April 7, 2003 (one month into his sentence), Dr. Kathryn A. Stolp wrote Director VonWald after treating Schaub for a pressure sore on his heel.  She stated:

> To prevent skin breakdown, decrease dependent edema (which leads to breakdown of his feet if not controlled), and for spasticity management, he [Schaub] requires a padded toilet seat, adequate accessible shower with padded shower bench, and a mechanism for elevating his legs as well as pressure-relieving mattress on his bed.  He cannot sleep completely flat without exacerbating his spasticity.  He has now developed a pressure sore on his left heel.
>
> I would appreciate your assessment as to whether his care needs can be met at the jail. . . . If the above conditions cannot be met, I guess I would advocate for him to be on home electronic monitoring.

The letter was reviewed by Dr. Molella, the physician in charge of ADC health care.  She entered notes in Schaub's file stating that the standards set by Dr. Stolp "will be extremely difficult to reliably provide in ADC," and that "the bed situation is still suboptimal."  Because Schaub was then in work release and still responsible for his own health care, Dr. Molella did not meet with him or treat him.

---

[2] While the dissenting opinion emphasizes that Schaub's initial pressure sore on his heel was "caused by wearing a shoe" in Minnesota in mid-March, *post* at 36, Schaub had edema and wore shoes well before he ever entered the ADC.  The "cause" of the pressure sore was the fact that the ADC failed to provide Schaub with bedding sufficient to elevate his legs high enough to drain and relieve the pressure.

On April 29, Schaub broke his femur after falling to the floor while trying to transfer from the toilet to his wheelchair. While he usually used the toilet at his apartment, on this occasion he "felt a deep personal urge," in the district court's words. The cell's only panic button was above the bed, out of his reach. His calls for help went unheard. After ten minutes or so, Schaub was able to pull himself up into the wheelchair and summon the guard. He was released to drive himself to the hospital. Schaub was admitted to the hospital for about a week, and had surgery to place a pin in his upper thigh.

After the fall, his attorney petitioned Judge Williamson for a sentence modification so Schaub could serve the rest of his sentence on electronic home-monitoring. The attorney specifically alleged that the ADC could not adequately meet his physical and medical needs. Schaub filed an affidavit detailing his health issues and the inadequacies of his cell at the ADC. The Olmsted County Attorney's Office opposed the request. Judge Williamson wrote ADC Director VonWald on May 13, inquiring whether the ADC could adequately accommodate Schaub's needs. Judge Williamson enclosed Schaub's affidavit, the April 7 letter from Dr. Stolp to VonWald, and a summary of his condition prepared by Dr. Stolp.

On May 15, Director VonWald wrote Judge Williamson. He said it was his belief that the ADC had addressed all of Schaub's needs "except the bed issue." VonWald noted that Schaub was given extra work-release time outside the ADC to address his medical and personal-hygiene issues, and that he had been instructed to bring in a toilet lift for use when he needed to use the bathroom at the ADC. VonWald added:

> We also instructed him to bring in whatever mattress and cushions he needed to take care of the lower and upper extremity problems he experiences. Certainly, we don't have a hospital bed that can be electronically adjusted but we felt that by allowing whatever he thought he needed in mattresses and cushions would fulfill the Doctor's orders.

. . . My staff and I are of the opinion, with participation and cooperation from Schaub he can serve out his sentence without his medical condition deteriorating simply because he is staying in the ADC.

On May 16, Judge Williamson denied the request to modify Schaub's sentence. She appended VonWald's letter to her order, which incorporated it by reference.

On July 15, Schaub returned to the ADC from home recovery. When he returned, he had a cast on his leg and open pressure sores on his thighs and heels. He was no longer eligible for work release, as he had lost his job. Therefore, he was placed in the general population of full-time detainees, so his medical care was the responsibility of the ADC. VonWald testified that he noticed "first thing in the morning" that Schaub had returned to the ADC and was placed in the general prison population, not in the work-release unit. While VonWald asked his prison staff to ask the medical staff to "check" with Schaub, he did not make any inquiry to the ADC medical staff to find out whether the ADC could fully provide for Schaub's care (when Schaub was in work-release, he showered at home in a handicapped-accessible shower with a padded bench, performed his bowel care at home on a handicapped-accessible toilet with a padded seat, and had the assistance of his mother with changing his bandages).

On July 16, an ADC nurse evaluated Schaub. She noted that he required a catheter bag, wound dressings, a bed pan, a toilet raiser, a shower chair, risers for his feet and head, and two mattresses until "a new thicker one" could be found (Schaub left the ADC before a thicker mattress was provided). The nurse allowed him to have a sheepskin for his bed. She arranged outside medical appointments for him on July 24 and 25, a week later.

Schaub testified that the additional bedding items he was provided were insufficient to cushion him and elevate his legs high enough to drain. He did not request any further special bedding because he did not know that VonWald had said

he could bring in outside materials such as foam wedges, mattresses, or a padded toilet seat, and no member of the ADC staff ever communicated this to him. VonWald testified that while he told his staff to let Schaub bring in additional items, no member of his staff ever said that this information was conveyed to Schaub, and VonWald never followed up. Dr. Molella testified that she did not think at the time that using extra prison mattresses and pillows instead of a pressure mattress was going to fix things, but it was an "attempt" to meet Schaub's needs.

On July 17, Schaub was seen by Dr. Molella. She noted several pressure sores: a 2.5cm sore on his lower buttock, a 2.5cm sore on his right ankle, and two separate ulcers on his left heel. Dr. Molella also noted a 4cm x 5cm area of pressure on his sacral (lower-back) region, which was red but not ulcerated. Dr. Molella dressed his wounds and wrote in his file:

> His ability to reposition himself in bed is extremely limited due to the lack of grab bars of any kind. He has foam wedges in his cell, two mattresses and a sheepskin. While these are improvements, I am not certain they are adequate adaptations to treat the current skin problems, and to address prevention of further problems.

Dr. Molella further recorded that Schaub's skin breakdown "is a serious issue at this time. Close surveillance and assistance with dressing changes is required." She indicated that he should be repositioned hourly, and that the ADC may need to provide him a second cell to change the direction he faces (ADC head-count protocols required detainees to keep their heads at one end of the bed, making it impossible for him to switch sides and still be facing toward the door). Schaub was never provided a second cell.

Later that same day, a nurse wrote in Schaub's file about a plan to locate a commode with arm rails and a shower bench for use in the handicapped shower. If this were unsuccessful, the ADC would offer him the option of showering in the

medical facilities on Tuesdays through Fridays. The nurse noted that he might be moved to the handicapped cell in the work-release unit, and that the ADC might have to contact an outside nursing agency for wound care.

According to ADC records, there was no further action or treatment for the next five days. His wounds were not dressed; he was not bathed. Schaub asked for such assistance daily in written notes ("kites") to ADC staff (these notes are missing due to the ADC's document-retention policy). At one point, he asked an ADC corrections officer to help change his bandages, but the officer refused as it fell outside his training and responsibilities. Schaub complained about his situation to the deputies and at least one sergeant, to no avail.[3]

On July 22, a nurse from an outside nursing agency assessed Schaub in the presence of an ADC nurse. The nurses noted a "strong odor" from a wound on his ankle, and received telephone approval from Dr. Molella to provide him an oral antibiotic. Schaub was approved for bi-weekly baths and changing of the dressings on his wounds. He was also approved to have two extra pillows in his cell to elevate his buttocks, lessening the pressure on his coccyx. The ADC nurse wrote that she would try to find a different wheelchair to keep his legs elevated.

On July 23, Schaub was bathed for the first time in eight days, during which he had soiled himself in his clothes several times until a toilet chair was acquired. An ADC nurse examined him and applied new dressings to his left heel, right ankle, and buttocks. The nurse noted a "[l]arge area" of new skin breakdown on his sacral area, and scheduled him to see Dr. Molella the next morning.

---

[3] True, as the dissenting opinion notes, Schaub did not use the formal grievance process to protest the lack of medical care. However, he testified he had no knowledge of a formalized grievance system.

On the morning of July 24, Dr. Molella and an ADC nurse examined Schaub. They smelled a strong odor when entering his cell. His right hand was "edematous and red to mid-forearm." Dr. Molella sent him to an emergency room for evaluation and treatment. According to her notes, since his initial incarceration in work release, his symptoms had worsened and his health had continued to decline. She wrote that in his current state, the ADC could not provide the skin care and other skilled nursing support required to improve and manage his condition. Dr. Molella recommended that he not be returned to the ADC, given the decline in his health while there, but if he must return, not until he was back to his baseline mobility and his skin was fully intact. She noted that if he must be held for security reasons, his condition required an infirmary setting with special bedding and 24-hour nursing support.

On July 24, the same day Schaub was admitted to the hospital, Judge Williamson ordered him released from the ADC until his medical issues were resolved. Four days later, Judge Williamson vacated the remainder of his sentence.

Schaub's condition continued to decline after being released. The damage from the infected pressure sores on his buttocks extended through the full thickness of the skin to the bone. Multiple surgeries were eventually required to close the wounds. A bone infection resulted in the loss of part of Schaub's hip and the head of his femur. All told, his injuries took at least four years to heal and resulted in the loss of much of his upper-body strength because he was bedridden. During this time, he endured significant pain and was unable to work.

Schaub sued Steven C. VonWald, Olmsted County, the ADC, and various ADC employees, alleging constitutional violations under the Eighth Amendment and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). He also alleged violations of the Americans with Disabilities Act. After a bench trial, the district court held that his Eighth Amendment rights were violated by VonWald, who was deliberately indifferent to his serious medical needs from the time he re-entered the

ADC after breaking his leg, until sent to the hospital. The district court entered judgment for the defendants on the *Monell* and ADA claims. The district court awarded Schaub $114,000 for lost wages, $100,000 for pain and suffering, and $750,000 for punitive damages. This appeal followed.

## II.

VonWald challenges the district court's finding that he deliberately disregarded Schaub's serious medical needs. He further contends that there was insufficient evidence that Schaub's injuries were caused by the acts of VonWald.

## A.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." ***Helling v. McKinney***, 509 U.S. 25, 31 (1993). To prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs. ***Coleman v. Rahija***, 114 F.3d 778, 784 (8th Cir. 1997). This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it. ***Id.***; *see also* ***Farmer v. Brennan***, 511 U.S. 825, 837 (1994); ***Estelle v. Gamble***, 429 U.S. 97, 105 (1976).

A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." ***Camberos v. Branstad***, 73 F.3d 174, 176 (8th Cir. 1995). A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary. ***Hartsfield v. Colburn***, 371 F.3d 454, 457 (8th Cir. 2004).

-10-

Deliberate indifference is equivalent to criminal-law recklessness, which is "more blameworthy than negligence," yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate. *See Farmer*, 511 U.S. at 835, 839-40. An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate. *Lenz v. Wade*, 490 F.3d 991, 995 (8th Cir. 2007). Deliberate indifference must be measured by the official's knowledge at the time in question, not by "hindsight's perfect vision." *Id.* at 993 n.1 (quoting *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998).

Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are questions of fact. *Coleman*, 114 F.3d at 785. After a bench trial, this court reviews the district court's findings of fact for clear error. *Lenz*, 490 F.3d at 994; *see also* Fed. R. Civ. P. 52(a). A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). This standard does not entitle a reviewing court to reverse the finding of the trier of fact simply because it would have decided the case differently if finding the facts de novo. *Anderson*, 470 U.S. at 573. If the district court's account of the evidence is plausible in light of the record viewed in its entirety, this court may not reverse it even though convinced this court would have weighed the evidence differently if sitting as the trier of fact. *Id.* at 573-74. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Id.* at 574. When findings are based on witness credibility, Rule 52(a) demands even greater deference to the trial court's findings. *Id.* at 575.

The district court found that VonWald was deliberately indifferent to Schaub's serious medical needs from the time he re-entered the ADC on July 15 until

transported to the hospital on July 24. The court found that treatment of his pressure sores, edema, and spasticity required close observation, regular dressing of his wounds, a mechanism sufficient to elevate his legs, a pressure-relieving mattress on his bed, and grab bars to allow repositioning himself in bed. The district court concluded that Schaub's condition was sufficiently serious to constitute a serious medical need. The letter from Dr. Stolp and the medical staff's observations (documenting new areas of skin breakdown) were sufficient verifying medical evidence of the escalating seriousness of his condition if not treated properly. Regardless, the district court found that his oozing sores and the smell of infection made his serious medical needs "more than obvious" to a layperson. See *Hartsfield*, 371 F.3d at 457. Based on the record here, the district court did not clearly err in finding that Schaub's condition constituted a serious medical need.

The district court then found that VonWald was aware of and deliberately disregarded Schaub's serious medical needs by ignoring the concerns raised by his doctors and Judge Williamson. VonWald objects that he played no role in his care and treatment other than to approve a request to allow an outside nursing agency to assist with Schaub's care. He further argues that Schaub failed to offer verifying medical evidence that VonWald ignored an acute or escalating condition or that delays adversely affected his prognosis. *See Dulany v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997) (finding that the objective portion of the deliberate indifference standard "requires a showing of 'verifying medical evidence' that the defendants ignored an acute or escalating situation or that delays adversely affected the prognosis given the type of injury.").

An official such as VonWald may be held liable under the Eighth Amendment if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 847. The factual determination that an official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence, or from the very fact that the risk was

-12-

obvious. *Id.* at 842. The letter to VonWald from Dr. Stolp—also forwarded to him by Judge Williamson—explained that Schaub had pressure sores, and that his condition required: 1) a padded toilet seat; 2) a handicapped-accessible shower with padded shower bench; 3) a mechanism for elevating his legs in bed; and 4) a pressure-relieving mattress on his bed. This was sufficient to find VonWald was aware of Schaub's medical needs.[4] *See id.* at 842-43 (where the evidence shows that a substantial risk to the inmate's health was well-documented and the circumstances suggest that the defendant-official was exposed to information about the risk and thus must have known about it, then such evidence is sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk). Further, VonWald was aware almost immediately upon Schaub's arrival at the ADC on July 15 that he had been placed in the general population of full-time detainees instead of in work release. VonWald thus knew that Schaub's medical care was the sole responsibility of the ADC.

VonWald claims that there was no evidence that he knowingly disregarded Schaub's medical needs. However, the record shows that VonWald falsely assured a judge of his ability to handle Schaub's medical care. Judge Williamson explicitly asked whether the ADC could accommodate Schaub's needs. VonWald wrote back that Schaub had been instructed "to bring in whatever mattress and cushions he needed," and that "by allowing whatever he thought he needed in mattresses and cushions," the ADC would fulfill his needs. The district court found this statement

---

[4] The dissenting opinion stresses that when reading this letter, VonWald was under the impression that Schaub would remain in work release upon his return to the ADC after recuperating from his broken leg. However, this ignores the fact that Schaub was suffering from *bed* sores, and all detainees (full-time or work-release) sleep at the ADC, a facility without a pressure mattress or grab bars to allow repositioning. As Schaub stated in his affidavit in support of his petition for electronic home-monitoring, "I am usually only sleeping there, and it is the sleeping time that is causing the damage to my body."

by VonWald to be a falsehood that created a false impression with Judge Williamson. VonWald himself testified that he had no intention of providing a pressure-relieving mattress for Schaub, as the ADC's fire-prevention protocols did not allow outside mattresses.[5] The district court found that VonWald's wrongful assurances to Judge Williamson showed deliberate indifference, because VonWald knew the ADC could not fulfill Schaub's needs (the fact that the ADC could not accommodate his known needs was an explicit finding of fact by the district court).

VonWald took no steps to assure himself that the ADC could in fact handle Schaub's medical needs either before his return to the ADC or upon learning that he had been placed in the general population of full-time detainees (instead of work release). Prior to Schaub's return, VonWald was on notice that the ADC could not accommodate his needs. Dr. Molella testified that her response to Dr. Stolp's letter was: "I absolutely commented, and shared with the jail staff that, in fact, they had not met the standard that had been requested by the physician." When asked about her

---

[5] The dissenting opinion claims this court over-emphasizes that VonWald never intended to provide a pressure-relieving mattress, as Schaub had a regular mattress at home and the ADC provided him with additional bedding materials. Schaub did testify he had a regular mattress at home on his hospital bed in the years before he had problems with pressure sores, because at the time he had intact skin, a padded toilet seat, a padded shower bench, and a bed with enough rails and room to reposition himself regularly. He also testified that the additional bedding the ADC provided him was insufficient to alleviate his pressure sores or allow his legs to drain. Dr. Molella confirmed that "we couldn't bring in the kinds of mattresses that would be helpful for Mr. Schaub, primarily because there was a fire marshal or a safety concern with those mattresses." In any event, the (non)provision of a pressure mattress was not the *sine qua non* of the Eighth Amendment violation found by the district court. Aside from the pressure mattress, Schaub still required grab bars or some other mechanism to reposition his body regularly (the dissent points out that Dr. Molella wrote that he should be repositioned hourly, but there is no indication this was ever done). He still required his wounds to be regularly cleaned, his dressings changed, regular bathing, and a handicapped-accessible toilet with a padded toilet seat.

advice to VonWald in light of the the lack of adequate bedding, padded seats, or a way of keeping pressure off Schaub's wounds, Dr. Molella testified: "What advice I gave to director VonWald, as I recall it, was that I believe that electronic home monitoring would be a simpler choice. That's what I told him." She also testified that the ADC medical staff received no advance notice that Schaub was being returned to the ADC on July 15, and that neither VonWald nor any other ADC staff member specifically asked her whether the ADC could medically care for Schaub.

When VonWald learned on July 15 that Schaub had returned to the full-time detainee population and his medical care was the sole responsibility of the ADC, he knew his statements to Judge Williamson were clearly no longer true—VonWald's letter had assumed that much of Schaub's medical needs would be met by his outside physicians and ability to go home for bathing and bowel care. After all, the context of VonWald's response to the judge was a petition for Schaub—a work-release detainee with access to outside physicians and a handicapped-accessible home by day—to serve out the remainder of his sentence on electronic home-monitoring because the ADC could not meet his medical needs during the limited time each day he was in the ADC.

In fact, other than VonWald's wrongful statement to the judge that Schaub could bring in a pressure mattress, most of the "accommodations" the ADC made consisted of letting him take extra time at home to do his bathing in a handicapped-accessible shower with padded shower bench, and his bowel care on a handicapped-accessible toilet with padded toilet seat (not to mention that at home Schaub's mother assisted him with cleaning and dressing his pressure sores). Yet VonWald never made any direct inquiries with the ADC medical staff to assure himself the ADC could adequately care for Schaub's medical needs on a full-time basis. An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate. *Lenz*, 490 F.3d at 995.

-15-

Although VonWald asked his staff to ask the medical staff to "check" with Schaub upon his arrival, he did not make any inquiry to the ADC medical staff to find out whether the ADC could fully provide for his care. VonWald testified that he normally "would have" made such an inquiry, but had no recollection of doing so. He testified that the person he normally "would have" made such an inquiry to was Captain Stacy Sinner, who was responsible for overseeing the ADC staff. Captain Sinner, in turn, testified that she had no recollection of any conversation with VonWald or Dr. Molella regarding Schaub, other than a conversation in which VonWald told her that Judge Williamson had contacted him and that "the judge wanted us to work very diligently to, umm, ah, to accommodate Mr. Schaub so that he could be in jail." The district judge, in the best position to evaluate VonWald's credibility, made a factual finding that "there was not a single indication of an inquiry of any sort by senior administrative staff in the facility."

Despite VonWald's knowledge of Schaub's needs, he never checked with the ADC medical staff at any time after Schaub's return to determine whether he was receiving the medical treatment Dr. Stolp ordered—when any inquiry into Schaub's treatment (or an examination of his medical file) would have revealed that his treatment was entirely insufficient.[6] VonWald took no steps to acquire a pressure-relieving mattress for Schaub (nor did he ever intend to). VonWald never followed-up to see if Schaub was aware he could bring in his personal foam wedges. VonWald took no steps to see if Schaub had access to a handicapped-accessible shower or was otherwise being bathed—VonWald testified that while he was aware that other ADC detainees have access to a shower daily, with regard to Schaub, "I just assumed — I gave it to the medical team, and I assumed that those problems were

---

[6] Contrary to the dissent's formulation, this court does not hold that VonWald had a duty to assume the hands-on management of Schaub's care. Prison officials are not doctors. This court holds that when personally confronted with the serious medical needs of a prisoner, prison officials cannot be deliberately indifferent to those needs by inaction, a well-established proposition.

going to be taken care of." When asked if he ever followed up, he answered "No." Finally, VonWald took no steps to see if Schaub had access to a handicapped-accessible toilet with a padded seat. While "a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement," *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987), VonWald was personally involved in the decision to return Schaub to the ADC and was responsible for seeing that he was adequately cared for once his needs were brought to VonWald's attention. *See Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (noting that even though defendant prison supervisor was "not a medical doctor and does not personally treat inmates' medical needs, . . . [t]here is no doubt that [defendant] has a constitutional duty to see that prisoners in his charge who need medical care receive it."); *see also West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody.").

Meanwhile, Schaub's condition was rapidly deteriorating. Schaub had new areas of skin breakdown in addition to his existing pressure sores, some of which were infected; his dressings were not being adequately changed; he was not bathed; he had no grab bars to reposition himself in bed.[7] During this time, he went five days without being treated by any medical personnel—the five days *after* Dr. Molella characterized Schaub's pressures sores as "a serious issue . . . [requiring] [c]lose surveillance and

---

[7] The dissent stresses that Schaub had pressure sores when he re-entered the ADC. While Schaub had previously had superficial pressure sores that healed quickly through prompt medical attention, he had never had his medical needs ignored until after the sores were so infected that skin and surrounding bone were eventually eaten away. The district court found Schaub credible. Schaub testified, while explaining a picture of the blackened, rotten pressure sores on his heels, "my heels weren't in this bad a shape until after I was in jail the second time and not, not helped with the bandage changing."

assistance with dressing changes."[8]  This constituted a need for medical attention that would have been obvious to a layperson, making submission of verifying medical evidence unnecessary.  *See Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir.1999); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation).  The district court's finding that VonWald was subjectively aware of Schaub's needs and deliberately disregarded them was not clearly erroneous.

The dissenting opinion raises other arguments: 1) Schaub never asked to see a doctor; 2) Dr. Molella did not think Schaub's medical needs were being ignored during the time in question; and 3) VonWald had no way of knowing that Schaub was experiencing serious harm because he had no interaction with Schaub.

---

[8] The dissenting opinion emphasizes that Dr. Molella testified that a DuoDERM dressing (a "second skin" that provides a moist, wound-healing environment) does not invariably have to be changed daily, and "can stay on until, essentially, the wound is healed."  However, Dr. Molella qualified this statement, saying the frequency of dressing "depends on if it's continuing to adhere, it depends on whether it continues to be functional, if it's covering the area that needs to be covered."  Nurse Anne Polikowsky testified that DuoDERM dressings are changed every three days, or as needed.  After some of Schaub's wounds were dressed with DuoDERM on July 17, they were not changed until July 23.  Most importantly, it was Schaub's testimony that rather than actually being dressed with DuoDERM, the pressure sores on his heel wounds were dressed with a traditional wet-to-moist or wet-to-dry gauze dressing that must be changed at least twice daily to prevent the dressing from drying out.  Dr. Molella, asked about Schaub's testimony, did not disagree, indicating that she asked the nursing staff "that he be given the assistance he requested" with dressing his wounds.  Schaub testified that when his wounds were finally dressed on July 23, the dressings had become so dry that flesh came off with the dressing.  Regardless of the dressing, it was not "functional" on July 22 when the ADC medical staff noted a "strong odor" from Schaub's wounds, yet his wounds were not dressed (nor was he bathed) until more than 24 hours later.

-18-

Schaub testified that he did not specifically ask to see a doctor in his daily notes to the nursing staff, where he did ask to be bathed and have his wounds cleaned and dressings changed. This fact supports Schaub's point that he suffered from a need for medical attention that was obvious to a layperson. Schaub, a 46-year-old who had been a paraplegic for nearly 20 years, was suffering not for the first time from bed sores. Proper treatment required regular repositioning, regular baths, and to have his wounds cleaned and dressed before becoming so infected they could be smelled across a room—activities well within the ken of the nursing staff to whom he directed his daily kites. Moreover, Dr. Molella testified that it was the nurses' responsibility to assist with the dressing changes.

The dissenting opinion notes Dr. Molella's "watchful waiting" approach, arguing that if she thought the ADC could adequately meet Schaub's ongoing needs and the medical requirements in Dr. Stolp's letter, there was no reason for VonWald to suspect that the ADC could not handle his needs. However, this argument ignores much of Dr. Molella's testimony—that she was trying to do the best she could after VonWald had told her Schaub was going to remain in the ADC. According to Dr. Molella, before Schaub's re-entry to the ADC she "absolutely commented, and shared with the jail staff that, in fact, they had not met the standard that had been requested by the physician." She testified that her advice to VonWald was that Schaub be placed on electronic home-monitoring instead of returning to the ADC, and that no one asked her, when Schaub returned, whether the ADC could handle his full-time care. She testified that upon his return, "[t]here were health accommodations that we were *attempting* to provide for him that I don't believe we had been able to provide for him because of the barriers to obtaining them, whether it was wheels on the shower chair or a means to better access his call button or those kinds of concerns that he had asked us about, and we were working on *trying* to meet those needs while he was there." (emphasis added).

-19-

The dissenting opinion is correct that VonWald had no personal interaction with Schaub. However, VonWald was aware of his serious medical needs and deliberately disregarded them by falsely assuring a judge the ADC could handle his needs and then failing to take the proper steps to insure that the ADC could provide adequate care. A prison official may be liable if the official has actual knowledge of a substantial risk of serious harm. *See Kahle v. Leonard*, 477 F.3d 544, 551 (8th Cir. 2007) (noting that a prison official need not believe that serious harm will actually befall an inmate or have actual knowledge that the inmate is experiencing serious harm: "it is sufficient that the official knows of a substantial risk that the inmate will suffer serious harm."). When VonWald saw Schaub return to the special management unit, it was incumbent upon him to take the necessary steps to provide Schaub adequate medical care, or inform Judge Williamson that the ADC could not accommodate his full-time care; VonWald's inaction constituted deliberate indifference. *See Farmer*, 511 U.S. at 842 (noting that in an Eighth Amendment claim, "it is enough that the official acted *or failed to act* despite his knowledge of a substantial risk of serious harm.") (emphasis added); *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) (a supervisor is liable for an Eighth Amendment violation "when the supervisor's corrective inaction constitutes deliberate indifference"); *Boyd*, 47 F.3d at 968 (noting that a supervisor can incur § 1983 liability by turning a blind eye to an Eighth Amendment violation).

The clear-error standard of review governs this appeal. Ample evidence supports the district court's findings of fact that 1) the ADC could not accommodate Schaub's known medical needs; 2) VonWald knew the ADC could not accommodate his known medical needs; 3) VonWald misrepresented the ability of the ADC to care for his needs to a judge; and 4) VonWald failed to take adequate steps to provide Schaub medically-necessary care or have him removed from the full-time medical care of the ADC. Under the clear-error standard of review, this court may not reverse the findings of the district court simply because it would have weighed the evidence differently or decided the case differently if sitting as the trier of fact. *Anderson*, 470 U.S. at 573. If there are two permissible views of the evidence, the factfinder's choice

between them cannot be clearly erroneous. *Id.* at 574. When findings are based on witness credibility, as they are here, Rule 52(a) demands deference to the trial court's findings.[9] *Id.* at 575.

B.

VonWald argues that there was no evidence that he caused any of Schaub's injuries, because he entered the ADC with a complex medical condition that progressively worsened before, during, and after the time when ADC was responsible for his health care. Causation is generally a question of fact. *Parrish v. Ball*, 594 F.3d 993, 1000 (8th Cir. 2010). However, where the causal link is so tenuous as to justify taking it from the trier of fact, a court may decide the issue as a matter of law. *Ricketts v. City of Columbia*, 36 F.3d 775, 779-80 (8th Cir. 1994). After a bench trial, this court reviews the district court's findings of fact for clear error. *Lenz*, 490 F.3d at 994; *see also* Fed. R. Civ. P. 52(a).

In a related argument, VonWald contends that expert testimony was required to prove that VonWald and the ADC should have provided Schaub different treatment to alleviate his suffering. *See Alberson v. Norris*, 458 F.3d 762, 765-66 (8th Cir. 2006) (finding the failure to produce expert testimony that a lack of proper medical treatment caused inmate's death was fatal to a deliberate indifference claim, where the inmate's cause of death was pulmonary hemorrhage and renal failure resulting from Goodpasture Syndrome, a rare autoimmune disease difficult to diagnose because its symptoms present a "confusing clinical picture" and "[n]o definitive therapy exists."); *Robinson v. Hager*, 292 F.3d 560 (8th Cir. 2002) (finding that expert testimony was

---

[9] As the district court noted, "What I have is the plaintiff who claims that he needed daily care, no showing that he received it, and in this case I credit the plaintiff's testimony."

required to show causal link between prison officials' failure to administer blood pressure medication and an inmate's stroke).

In this case, expert testimony on causation was unnecessary because VonWald's deliberate indifference clearly exacerbated Schaub's wounds. *See **Ricketts***, 36 F.3d at 779-80 (if in a particular case relevant evidence of causation makes the issue "free from doubt," the court may find causation as a matter of law). The district court found that the seriousness of Schaub's wounds and his deteriorating condition were readily apparent to the untrained eye (and nose). Schaub suffered from bed sores that got infected—while serious, such sores are not susceptible to misdiagnosis, incapable of treatment, or a sophisticated medical condition resulting from myriad attenuated causes.[10] The district court also found that the ADC could not accommodate his

---

[10] Contrary to the implication of the dissenting opinion, VonWald was not assessed damages for Schaub's femur fracture or the surgery to repair it. Damages were assessed for the complications from bed sores that became infected in the ADC, which included years of being bedridden in what Schaub described as "horrific pain" with accompanying loss of income and mobility. Toward the end of this period, Schaub had surgery to close the wounds, which resulted in Schaub losing the upper part of his femur and part of his pelvis. According to Schaub, "the infection had gotten so bad that it literally had eaten the whole femur head up." Schaub's bed sores on his right ischial (buttocks) and sacral (lower back) regions initially began as superficial pressure sores from small bruises sustained in the fall (the fracture happened when he transferred to his wheelchair and landed on the edge of the seat, causing the chair to slide backwards and Schaub to fall hard on his right knee and topple to the floor).

However, at the time of his pressure sore surgeries, the femur fracture (on the knee end) was years in the past and not a proximate source of his ongoing problems. Schaub had experienced superficial pressure sores without incident in the past, and there is no evidence Schaub's pressure sores were infected before his deficient treatment in the ADC. Thus, the district court's award of compensatory damages for pain and suffering and loss of income for the years Schaub spent bedridden had little to do with his earlier fracture or surgery.

known needs, yet VonWald, aware of these needs, hid this fact from Judge Williamson.

The dissenting opinion asserts that any connection between the VonWald letter and the denial of Schaub's home-monitoring request is "pure speculation," *post* at 36. The VonWald letter cannot be divorced from its context–Schaub's petition for home-monitoring was on the basis that the ADC could not adequately meet his physical and medical needs, and VonWald was responding to a direct judicial inquiry on the ability of the ADC to meet those needs. Based on this specific inquiry to VonWald and the fact that Judge Williamson appended VonWald's letter to her order denying Schaub's petition and incorporated it by reference, the district court correctly reasoned that Judge Williamson would have denied Schaub's petition if VonWald had accurately represented that the ADC could not adequately care for him. The district court properly concluded VonWald's affirmative misrepresentation of the ADC's capabilities has a direct connection to the subsequent deterioration of Schaub's condition.

The evidence showed that treatment of Schaub's pressure sores, edema, and spasticity required close observation, regular dressing of his wounds, a mechanism sufficient to elevate his legs, a pressure-relieving mattress, and bedside grab bars that would allow repositioning. The district court found that VonWald failed to attend to these needs: upon his return to the ADC, Schaub was placed in a cell without a pressure-relieving mattress, grab-bars, a padded toilet seat, or a shower he could use. He went for days without being bathed, having his wound dressings changed, or seeing a doctor—all while his daily requests for assistance were ignored. The testimony of Dr. Molella and three ADC nurses, along with the abundant notes in Schaub's file documenting his decline and the shortcomings of the ADC in treating his condition, were evidence that VonWald's deliberate indifference to his condition

-23-

caused a substantial risk of serious harm to him. The district court did not clearly err in finding VonWald's deliberate indifference caused injury to Schaub.[11]

## III.

VonWald appeals the district court's award of $750,000 in punitive damages. His issue is stated as: "The district court abused its discretion in its award of punitive damages to Phillip David Schaub because of a lack of evidence of improper conduct and lack of evidence of the personal financial resources of VonWald."

Punitive damages may be awarded under 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Punitive damages punish a defendant for outrageous, intentional, or malicious conduct, and deter similar extreme conduct in the future.[12] *Id.* at 54; *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266-67

---

[11] The dissenting opinion claims there is little evidence about the extent to which VonWald's conduct aggravated Schaub's pressure sores, and claims the compensatory damages compensated him for his decline after he left the ADC, rather than for any injury caused by VonWald. Schaub, a paraplegic for nearly 20 years, had occasionally experienced superficial bed sores that quickly healed through adequate medical care. Due to complications from infected bed sores that were not adequately treated in the ADC, Schaub endured multiple surgeries, four years of significant pain, loss of income, and a permanent loss of future mobility. There is no evidence that Schaub's pressure sores were infected when he entered the ADC.

[12] The dissenting opinion contends that VonWald could not be further deterred by punitive damages because by the time of trial he was no longer the ADC director. This contention ignores the deterrence rationale of punitive damages—to deter *others* in addition to punishing the defendant. *See Coleman*, 114 F.3d at 787 (noting that punitive damages are awarded to "'punish the defendant for his [or her] willful or malicious conduct *and to deter others* from similar behavior.'" (quoting *Memphis*

(1981).  It is a question of fact whether a defendant's conduct was motivated by an evil motive or involves reckless indifference to the federally protected rights of others. *Coleman*, 114 F.3d at 787.  After a bench trial, this court reviews the district court's findings of fact for clear error, and its legal conclusions de novo. *Lenz v. Wade*, 490 F.3d 991, 994 (8th Cir. 2007); *see also* Fed. R. Civ. P. 52(a).  A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  A reviewing court should not reverse the finding of the trier of fact simply because it would have decided the case differently if finding the facts de novo. *Anderson*, 470 U.S. at 573. If the district court's account of the evidence is plausible in light of the entire record, this court may not reverse even though convinced this court would have weighed the evidence differently if sitting as the trier of fact. *Id.* at 573-74. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Id.* at 574.  When findings are based on witness credibility, Rule 52(a) demands even greater deference to the trial court's findings. *Id.* at 575.

Once the callousness threshold is met, an award of punitive damages is a "discretionary moral judgment" reviewed only for an abuse of discretion, a "highly deferential standard of review." *Royal v. Kautzky*, 375 F.3d 720, 724 (8th Cir. 2004) (noting that a district court has discretion to make a judgment call "without fear of inappropriate appellate intervention"); *Coleman*, 114 F.3d at 787; *see also Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433 (2001) ("If no

---

*Community Sch. Dist. v. Stachura*, 477 U.S. 299, 306 n. 9 (1986) (emphasis added). Other prison administrators should be deterred from making a false response to a direct judicial inquiry and completely failing to provide adequate care for an inmate's serious medical needs.

constitutional issue is raised,[13] the role of the appellate court, at least in the federal system, is merely to review the trial court's determination under an abuse-of-discretion standard.") (internal quotation makes and citation omitted); ***Cooter & Gell v. Hartmarx Corp.***, 496 U.S. 384, 401 (1990) ("When an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable: A court of appeals would be justified in concluding that a district court had abused its discretion in making a factual finding only if the finding were clearly erroneous."). In sum, an appellate court should not lightly reverse a district court's decision to award—or not award—punitive damages in a § 1983 case. ***Royal***, 375 F.3d at 724.

VonWald appears to attack the legal sufficiency of the evidence supporting the district court's factual determination that his conduct involved reckless or callous indifference to Schaub's medical needs—the threshold inquiry for the award of punitive damages. Although VonWald did not object at trial or post-trial to the punitive damages award, this court may still review the sufficiency of the evidence because this case was tried to a judge instead of a jury. *See* Fed. R. Civ. P. 52(a)(5) (In an action tried on the facts without a jury, "[a] party may later question the sufficiency of the evidence supporting the findings, whether or not the party requested findings, objected to them, moved to amend them, or moved for partial findings");

---

[13] VonWald did not raise the constitutionality of the punitive damages award in the district court or before this court. In fact, VonWald's reply brief states that the analysis in *BMW of North America v. Gore* "has no applicability to this matter," and contrasts his own argument (that the district court's factual determination of reckless indifference is clearly erroneous) with an evaluation of the constitutionality of the punitive damages award. *See* ***Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.***, 492 U.S. 257, 276-77 & n.23 (1989) ("Because petitioners failed to raise their due process argument before either the District Court or the Court of Appeals, and made no specific mention of it in their petition for certiorari in this Court, we shall not consider its effect on this [punitive damages] award. . . . We shall not assume that a nonconstitutional argument also includes a constitutional one.").

*Phoenix Assur. Co. of N. Y. v. Appleton City, Mo.*, 296 F.2d 787, 795-96 (8th Cir. 1961) ("Since this case was tried to the court and a Master, by reason of Rule 52(b) [now Rule 52(a)(5)] the plaintiff was not required to raise the question of the sufficiency of the evidence to support the findings in the trial court to lay the foundation for its appeal.").

The district court found that VonWald's conduct involved reckless or callous indifference to Schaub's serious medical needs because he ignored the medical concerns raised by Schaub's doctors and Judge Williamson. While prison supervisors cannot held liable under § 1983 on a theory of respondeat superior, they can incur liability when their corrective inaction amounts to deliberate indifference to or tacit authorization of an Eighth Amendment violation. *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010). "Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989).

A finding of deliberate indifference to a serious medical need, while establishing liability under § 1983, does not necessitate a finding of callous indifference warranting punitive damages. *Coleman*, 114 F.3d at 787. Here, the record shows that the ADC could not accommodate Schaub's known needs, and that VonWald knew this fact. VonWald himself testified that he had no intention of providing him a pressure-relieving mattress, as the ADC did not allow outside mattresses. Despite this knowledge, VonWald made false statements in response to a direct judicial inquiry concerning the ability of VonWald and the ADC to protect Schaub from further injury. Judge Williamson was considering the option of electronic home-monitoring, and asked VonWald his view whether the ADC could adequately accommodate Schaub's needs. VonWald stated that the concerns of Dr. Stolp and Schaub could be addressed at the ADC. After Schaub's re-entry to the ADC, VonWald failed to take adequate steps to provide him necessary care or remove him from the ADC. This was a sufficient evidentiary basis for the district court to find

-27-

that VonWald's behavior called for an award of punitive damages. *See Smith*, 461 U.S. at 56 (holding that punitive damages in a § 1983 action are permissible upon a showing of reckless or callous indifference to a prisoner's Eighth Amendment rights, notwithstanding that the underlying standard of liability for an Eighth Amendment violation was also one of recklessness).

The dissenting opinion faults the district court for not making findings on the need for additional deterrence or punishment. On the contrary, the district court stated that punitive damages are appropriate where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56. The court then expressly found that 1) Schaub had a clear and obvious serious medical need known to VonWald, 2) VonWald gave a false and misleading reply to a direct judicial inquiry concerning the ability to care for him, and 3) VonWald showed reckless and callous indifference in failing to provide Schaub necessary care, resulting in a direct consequence of four years of pain, loss of income, and loss of future mobility. The court then made an explicit finding that VonWald's conduct merited a punitive award of $750,000 in addition to the compensatory award: "I find it appropriate to award punitive damages in the amount of $750,000 as a consequence of these determinations." The district court adequately explained the appropriateness of punitive damages, and did not need to make additional findings on the need for punishment or deterrence. *See id.* at 54 (noting that "society has an interest in deterring and punishing *all* intentional or reckless invasions of the rights of others") (emphasis in original).

As part of his argument, VonWald asserts that the district court should have made findings of fact on his ability to satisfy a punitive damages award before awarding punitive damages. At most, this court reviews this assertion for plain error, as Von Wald never objected at trial to the award of punitive damages or requested findings of fact on his ability to pay. *See Wiser v. Wayne Farms*, 411 F.3d 923, 927

(8th Cir. 2005) ("an unpreserved error in the civil context must meet at least the *Olano* standard to warrant correction."). "'Plain error is a stringently limited standard of review,' especially in the civil context, and must result in a miscarriage of justice in order to compel reversal." ***Horstmyer v. Black & Decker, (U.S.), Inc.***, 151 F.3d 765, 771 (8th Cir. 1998) (quoting ***Rush v. Smith***, 56 F.3d 918, 925 (8th Cir. 1995) (en banc)).

While Civil Rule 52 permits appellate review of the sufficiency of the evidence in a bench trial, legal errors by the district court must still be objected to in order to be preserved for review. *See **Miller v. Bittner***, 985 F.2d 935, 940 (8th Cir. 1993) (noting that although the federal courts give Rule 52 full effect when applicable, "the general principle of Rule 46 [that issues not raised and preserved below will not be considered on appeal] is still controlling and that, except as specifically otherwise provided in Rule 52, it is necessary that a party make known to the trial court his objection to the action taken by it and the grounds of the objection.") (quoting 9C Wright & Miller, Federal Practice and Procedure § 2581); *see also **Porterco, Inc. v. Igloo Products Corp.***, 955 F.2d 1164, 1173 (8th Cir. 1992) ("To obtain appellate review of a trial court's acts or omissions a party must have made known to the [trial] court the action which the party desires the court to take or the party's objection to the action of the court and the grounds therefor.") (internal quotation marks and citation omitted); ***McNeely v. United States***, 353 F.2d 913, 917 (8th Cir. 1965) ("It is an axiom of trial procedure that counsel must take the initiative in protecting the rights of his clients. . . . A party may not stand idly by, watching the proceedings and allowing the Court to commit error of which he subsequently complains."). Waiver and forfeiture rules "'inform promptly the trial judge of possible errors so that he may have an opportunity to reconsider his ruling and make any changes deemed desirable.'" ***United States v. Castellanos***, 608 F.3d 1010, 1018 (8th Cir. 2010) (quoting ***Morrow v. Greyhound Lines, Inc.***, 541 F.2d 713, 724 (8th Cir. 1976).

Initially (and fatally), the burden was on VonWald to introduce evidence of his net worth. *See* **Grabinski v. Blue Springs Ford Sales, Inc.**, 136 F.3d 565, 570-71 (8th Cir. 1998) (holding that it is a defendant's burden to introduce evidence of net worth for purposes of minimizing a punitive damages award); *see also* **Latham Seed Co. v. Nickerson Am. Plant Breeders, Inc.**, 978 F.2d 1493, 1500 (8th Cir. 1992) (affirming an award of punitive damages where the defendant had an opportunity to provide the jury with information on net worth, but failed to do so). The complaint sought punitive damages, and Schaub's counsel argued for them (seeking a $6 million verdict) before the district court made findings of fact and awarded the punitive damages. VonWald introduced absolutely no such evidence, nor in any way indicated that his financial resources were relevant. The district court did not err, much less plainly err, by not making findings of VonWald's financial means before awarding punitive damages.[14]

---

[14] According to the dissenting opinion, *Bredberg v. Long* demands that this court set aside the punitive damages award because of a lack of evidence regarding the financial status of VonWald, and *Grabinski* "is at odds with *Hollins* and *Bredberg*," *post* at 57. *Bredberg* applied the law of Minnesota, that a punitive damages award for fraud must be supported by evidence as to the financial condition of the defendant. *See* **Bredberg v. Long**, 778 F.2d 1285, 1290 (8th Cir. 1985); Minn. Stat. § 549.20, subd. 3 ("Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including . . . the financial condition of the defendant . . ."); *but see* **Melina v. Chaplin**, 327 N.W.2d 19, 20 & n.1 (Minn. 1982) (rejecting a challenge to the size of a punitive damages award because "neither the trial court nor this court has been furnished with any evidence submitted by either party respecting [the defendant's] ability to pay the punitive damage award."). Neither *Bredberg* nor *Hollins* are inconsistent with *Grabinski*'s holding that as a matter of federal law, it is a defendant's burden to introduce evidence of net worth for purposes of minimizing a punitive damages award. *See also* **Mason v. Okla. Turnpike Auth.**, 182 F.3d 1212, 1214 (10th Cir. 1999); **Kemezy v. Peters**, 79 F.3d 33, 36 (7th Cir. 1996); **Fishman v. Clancy**, 763 F.2d 485, 490 (1st Cir. 1985).

To the extent VonWald styles his argument as an attack on the sufficiency of the evidence to support punitive damages because of the lack of net-worth evidence, such evidence is not necessarily required. VonWald cites no authority that evidence of a defendant's net worth is a prerequisite to an award of punitive damages. VonWald invokes the *Hollins* and *Bankers Life* cases, which state only that a defendant's wealth is one factor that may be considered in assessing an award of punitive damages. *See **Hollins v. Powell***, 773 F.2d 191, 197-98 (8th Cir. 1985) (noting that "in assessing punitive damages, it is appropriate to consider the defendant's net worth," and that "[w]e can see neither the justice nor sense in affirming a verdict which cannot possibly be satisfied" ); ***Bankers Life & Cas. Co. v. Kirtley***, 307 F.2d 418, 425 (8th Cir. 1962) (noting that "the wealth of the defendant is a factor to consider in an award of exemplary damages"); *see also **City of Newport***, 453 U.S. at 270 (noting that "evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded.").

To the contrary of VonWald's argument, "[t]he focus, in determining the propriety of punitive damages, is on the intent of the defendant and whether the defendant's conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards." ***Coleman***, 114 F.3d at 787 (internal citations omitted). Based on the district court's findings of fact, which are not clearly erroneous, the district court did not abuse its substantial discretion in awarding punitive damages in this case.

\* \* \* \* \* \* \*

The judgment of the district court is affirmed.

-31-

BEAM, Circuit Judge, dissenting.

In an effort to save the district court's ambiguous oral decision, which holds Director VonWald, a remote jailhouse administrator, individually liable for $214,000 in compensatory damages (without expert causation testimony) and $750,000 in punitive damages, the panel majority engages in fact finding, conjecture, and ultimately places upon prison officials Eighth-Amendment duties not heretofore recognized. Under the panel majority's newly forged theory of Eighth Amendment liability, a remote prison supervisor with general knowledge of a prisoner's potential for developing medical complications must engage in an immediate, personal, hands-on and continuing management of the prisoner's medical care even where the prisoner's medical care has been entrusted to highly trained medical professionals and the supervisor has no reason to believe such professionals are mistreating (or not treating) the prisoner. Moreover, the panel majority's affirmance of the district court's punitive award defies established Eighth Circuit precedent. To impose a punitive award in a § 1983 case, our precedent requires district courts to find (1) callous indifference; *and* (2) that a punitive award is necessary, in addition to compensatory damages, to further the goals of punishment and deterrence. Although the district court wholly failed to analyze the goals of punishment and deterrence, the panel majority props up the $750,000 punitive award with its own fact finding and analysis. Ultimately, when the unfortunate facts of this case are considered against the long-established and rigorous standards that govern deliberate indifference claims and punitive awards, it is clear that Schaub's claims against VonWald must fail. I respectfully dissent.

I.    BACKGROUND

Schaub's confinement at the ADC was split into two periods. The first period of confinement began on March 4, 2003, when Schaub, a paraplegic, began serving his 180-day sentence. This period ended on April 29, 2003, when Schaub fractured

his leg and was hospitalized. Neither the district court nor the panel majority finds Eighth-Amendment-defined deliberate indifference on the part of VonWald during this time frame.

During this interval, the ADC housed approximately 130 inmates in multiple housing units, including a special management unit and a work release unit. Schaub was initially housed in the work release unit, which permitted him to leave the ADC twelve hours per day to work and to use his home shower and toilet. Because of his work release, ADC policy dictated that Schaub's own private physicians, not the ADC medical staff, were responsible for his medical care.

Upon his arrival at the ADC, Schaub was provided with an extra mattress to prevent pressure sores. After a week-and-a-half of confinement, Schaub developed a pressure sore on his left heel after putting shoes on his feet, which were edematous because he was unable to sufficiently elevate his legs in bed. On April 7, 2003, Dr. Kathryn Stolp, one of Schaub's private Mayo Clinic physicians, wrote VonWald a letter stating that while under her medical care Schaub had developed the sore. Dr. Stolp explained that to prevent skin breakdown, decrease edema, and manage Schaub's spasticity, Schaub required a padded toilet seat, a special shower bench, a mechanism for elevating his legs, and a pressure-relieving mattress on his bed. At the conclusion of her letter, Dr. Stolp stated, "If [these] conditions cannot be met, I guess I would advocate for him to be on home electronic monitoring." On April 17, Dr. Robin Molella, the Mayo Clinic physician who supervised the ADC's medical staff, reviewed Dr. Stolp's recommendations. She noted in Schaub's medical file that the plan for permitting Schaub to take care of his shower and toilet needs at home was "adequate," but his bedding situation was "still suboptimal." Dr. Molella further noted that if Schaub must remain in the ADC "then we will request an evaluation of the environment by [Dr. Stolp] for adaptations."

On April 29, Schaub fell in his cell and broke his leg. Schaub transported himself to a local hospital where he underwent surgery and was hospitalized for about a week, thus ending the first period of confinement. As noted above, Schaub departed from this fifty-seven-day work-release period with one edema-induced sore on his left heel caused by tight shoes.

Between this first period of confinement and the second period of confinement, which began on July 15, Schaub, after the hospitalization, returned home to recuperate from leg surgery. On May 12, 2003, while at home under the care of his own physicians, Schaub, picking up on Dr. Stolp's April 7 comment, petitioned state court judge Jodi Williamson (sometimes state or sentencing judge) for a sentence modification that would permit him to carry out the remainder of his sentence on electronic home monitoring. To support the petition, Schaub filed (1) Schaub's sworn affidavit, dated April 25; (2) Dr. Stolp's letter, dated April 7; and (3) a hospital summary, dated May 3, which notes that Schaub broke his femur and that he had the one pressure sore on his left heel. Notably, all three documents indicated that Schaub was still in the ADC's work release program and there was no indication that Schaub was unemployed. Judge Williamson sent VonWald a letter requesting him to review these documents and to comment upon whether the ADC could accommodate Schaub.

On May 15, 2003, VonWald responded to Judge Williamson's letter, stating "I believe we have addressed all of [Schaub's] concerns except the bed issue." Obviously under the impression that Schaub would return to the work release unit and continue under the care of his private physicians, VonWald explained, "[W]e give him sufficient time out of the ADC to take care of any medical and personal hygiene issues that we don't address in the ADC." He also stated, "[W]e don't have a hospital bed that can be electronically adjusted but we felt that by allowing [Schaub to bring in] whatever he thought he needed in mattresses and cushions would fulfill [Dr. Stolp's] orders." At the conclusion of the letter, VonWald told Judge Williamson that "[t]he [electronic home monitoring] program is certainly an option. We can put him on GPS,

alcohol monitoring, and tighten down his day pretty snug. Additionally, I assume at your request the Probation Department can intensify their home visits and checks." VonWald did not inform Judge Williamson that he knew a fire code barred pressure-relieving mattresses at the ADC. On May 16, Judge Williamson, without explaining her action in any detail, denied Schaub's request to modify his sentence. VonWald then directed Captain Stacy Sinner, who was responsible for overseeing the operations staff of the ADC, to ensure that Schaub was accommodated.

I pause for a moment to contemplate the significance of VonWald's May 15 letter. It is this letter that was the basis for the federal district court's (district court) heated in-court disapproval of VonWald's later inaction with regard to Schaub, Trial Tr. vol. IV, 480, 485 (Dec. 17, 2009), a disapproval now joined by the panel majority (sometimes panel or majority) in this appeal, ante at 13. During this judicial exercise of disapproval, the district court made a finding that VonWald's communication to Judge Williamson contained falsehoods that gave her misleading impressions that presumably led to the denial of Schaub's petition for electronic home monitoring. And, this denial, in turn, in the eyes of the district court, was largely responsible for Schaub's physical deterioration when his incarceration continued in mid-July.

Given the circumstances extant at the time of the May 15 communication,[15] it is difficult to detect intentional or reckless falsity on the part of VonWald that could have been the wellspring for constitutionally defined deliberate indifference. And, indeed, except for Judge Williamson's denial of Schaub's home monitoring request and the documents attached to the order, there is no evidence in the record revealing

---

[15]VonWald had no way of knowing Schaub would return to the ADC two months later without work release privileges (the ability to visit his private physicians and to use his home shower and toilet) and with four pressure sores instead of one. And, since it was not contemplated that the ADC medical staff would assume responsibility for Schaub's medical care, VonWald's letter makes no assurances regarding the ADC medical staff's ability to accommodate Schaub.

Judge Williamson's state of mind as it might have been affected by VonWald's letter. Bluntly stated, and as the facts clearly establish, any perceived connection between the VonWald letter and the medical treatment accorded Schaub during his later incarceration is based upon pure speculation on the part of the district court.

As one can best understand the district court's rationale, it apparently believed that if VonWald had revealed to Judge Williamson that a fire code (not of VonWald's imposition) barred the ADC's use of the type of "pressure-relieving mattress" referenced in Dr. Stolp's April 7 letter, Judge Williamson would have granted Schaub electronic home monitoring. There is, of course, insufficient evidence in the record to make this anything but a guess. And guesses of this kind are clearly not the stuff of deliberate indifference, let alone callous indifference.

But, if guesses are allowed in cases such as this, it is a better guess that Judge Williamson's denial stemmed from opposition from the state prosecutor and the judge's reluctance in the face of such opposition (and the facts presented to her at that time) to release from custody an inmate who was required to register as a predatory offender because of his incarceration conviction–felony sexual conduct involving a child of less than thirteen years. Minnesota v. Schaub, No. K4024311/02058875 (Minn. Dist. Ct. Jan. 16, 2003) (sentencing order).

An even better guess emerges from the record before the court. Judge Williamson knew that Schaub had spent fifty-seven twelve-hour days at the ADC reclining on jail-issued bedding and mattresses. During this time he had developed but one sore on the heel which was caused by wearing a shoe (possibly while at work or at home) on his edematous foot. She also knew that the ADC could not supply a hospital bed to raise his feet to relieve the edema but could and would supply or allow Schaub to provide whatever mattresses and cushions he needed. And upon his return on July 15, the ADC medical staff did furnish Schaub (who admitted he never requested a pressure-relieving mattress and who testified he used a regular mattress

in his own home) an extra mattress, a sheepskin to reduce pressure and foam wedges for body elevation purposes. The staff was also directed to reposition Schaub hourly. Although the panel makes note of the fact that there is no proof that the repositioning occurred as ordered, there is, likewise, no evidence from Schaub, the bearer of the burden of proof of culpability, that it did not occur.

Thus, it is more likely that Judge Williamson reasonably thought VonWald's suggested alternatives, including adaptations to Dr. Stolp's various observations and recommendations, made his prognosis for care of Schaub viable, especially given the contemplated work-release scenario. And the prognosis made under such circumstances was reasonable and viable, even though, as it turned out, Schaub returned to the ADC in July in a considerably worsened physical condition. Indeed, the panel majority admits as much when it concedes that "the (non)provision of a pressure mattress was not the *sine qua non* of the Eighth Amendment violation found by the district court." Ante at 14 n.5.

After seventy-six days away in the hospital and at home recuperating, Schaub commenced his second period of confinement on July 15, a period that lasted parts of ten days. To VonWald's surprise, Schaub had lost his job and, thus, was no longer eligible for the work release program. Accordingly, Schaub was placed in the special management unit, which was designed to accommodate inmates with physical health needs. Schaub's move to this unit triggered a shift in his medical treatment; because Schaub was no longer in the work release program, he was not allowed to leave the facility, visit his own medical providers, or use his home shower and toilet. Rather, the ADC medical staff, supervised by Dr. Molella, became responsible for treating Schaub's medical needs. On July 16, Patricia Crandall, a registered nurse who worked at the ADC most weekdays, met with Schaub and noted in his medical file that he needed a catheter bag, wound dressings, a bed pad, raisers for his feet and head, a

toilet raiser, a shower chair, and two mattresses until a "new thicker one" was provided.[16]

Dr. Molella evaluated Schaub on July 17 and noted that Schaub's skin condition had become "serious." Indeed, while Schaub left the ADC on April 29 with one pressure sore on his left heel, Dr. Molella's notes reveal that Schaub returned to the ADC on July 15 with: (1) two (not one) separate ulcers on his left heel; (2) a new 2.5 centimeter ulcer on his right lateral malleolus (ankle bone); (3) a new 2.5 centimeter ulcer on his ischial (lower buttock) region; and (4) a developing 4 x 5 centimeter area of pressure on his sacral region. Dr. Molella dressed the wounds "as necessary" with DuoDERM bandages. She testified at trial that DuoDERM "acts as a second skin" and is usually not changed on a daily basis. According to Dr. Molella, depending on whether DuoDERM continues to properly adhere and whether it properly covers a wound, DuoDERM "can stay on until, essentially, the wound is healed."

Dr. Molella also noted on July 17 that Schaub had been provided with two mattresses and a sheepskin to reduce pressure from his bed, and foam wedges for body elevation purposes. She recognized these adaptations were "improvements" but noted that Schaub was unable to reposition himself in bed due to the absence of grab bars. Dr. Molella also inconclusively determined that she was "not certain [the improvements were] adequate adaptations."[17] At trial, Dr. Molella explained that she

[16]Nurse Crandall testified that, at that time, the ADC had started purchasing thicker mattresses and she was trying to locate one for Schaub.

[17]The panel majority emphasizes that Dr. Molella testified that she had no notice that Schaub would be returning to the ADC on July 15 and conceded that she told VonWald in April that she believed "electronic home monitoring would be a simpler choice." Of course, Judge Williamson's May 16 denial order directly responded to the electronic monitoring option and, under the Eighth Amendment, inmates are entitled to adequate medical care, not the "simpler choice" in sentencing alternatives. Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006). Moreover, immediately after the

employed a "watchful waiting" approach to determine whether "[Schaub's] condition was going to get better or get worse." Pursuant to this approach, Dr. Molella directed her staff (1) to closely monitor Schaub; (2) to assist with bandage changes; and (3) to aid in repositioning Schaub hourly.

Between July 17 and July 23, the treatment notes do not state that the ADC medical staff bathed Schaub or dressed his wounds. Schaub testified that he sent "kites," or written requests, to the nursing staff on a daily basis, requesting showers and bandage changes, but the staff denied such treatment. This may not have been true because evidence indicated that responses to kites were often made on the kites themselves instead of on the treatment notes. However, two years after Schaub was discharged from the ADC, the kites were discarded in the regular course of the ADC's document retention program. So, the district court credited Schaub's testimony. At trial, VonWald described the ADC inmate grievance process as follows:

> [G]enerally speaking, the detainee is dealing with front line deputies, and . . . then if he has a request for something that the deputy can't manage, then it goes up to the sergeant, and if the sergeant feels like it's a policy issue or something that needs to be addressed at a higher level, [it] would go to the captain, and if the captain is struggling with it also, then it would eventually end up on my desk. Once in a blue moon do I end up with a kite on my desk, but very, very seldom.

VonWald testified that he never received a kite from Schaub, despite the availability of a grievance appeal process.[18] Schaub similarly testified that he did not make any

_____

"simpler choice" testimony, Dr. Molella clarified, "I don't recall a conversation with director VonWald directly. What I recall is . . . that I spoke with one of the sergeants."

[18]The majority claims that Schaub was not aware of the grievance appeal process. However, the evidence does not support this attempt to avoid personal culpability since the "kite" system is an integral part of the grievance appeal structure. But, even assuming Schaub was not aware of the appeal process, the relevant point is

appeals to Captain Sinner or VonWald and conceded that he had no personal contact with either administrator while he was confined at the ADC. Schaub also testified that he never requested to see a doctor or made any requests for special bedding beyond the adaptations provided by the ADC medical staff.

Sometime between July 17 and July 22, Nurse Crandall requested VonWald's permission for an outside nursing agency to have access to Schaub. VonWald approved that request and, on July 22, a home health care nurse assessed Schaub along with ADC Nurse Anne Polikowsky. The nurses noted an odor emanating from one of Schaub's sores and provided Schaub an antibiotic with Dr. Molella's approval. Nurse Polikowsky's treatment notes do not indicate that Schaub's dressings were changed that day. She testified that she would have changed Schaub's DuoDERM dressings if they needed to be changed at that time. Nurse Polikowsky's notes also indicate that she gave Schaub extra pillows to keep pressure off his coccyx.

On July 23, ADC Nurse Rebecca Nesse examined Schaub after he was bathed. She placed new DuoDERM bandages on his existing pressure sores, noted a large area of new skin breakdown on his sacrum, and scheduled an appointment for Schaub to see Dr. Molella the next morning. Nurse Nesse explained at trial that she did not schedule an immediate appointment because "Mr. Schaub's life was not at risk. He had a chronic condition that we were doing our best to take care of."

On the morning of July 24, Dr. Molella examined Schaub and sent him to a private hospital's emergency room. Dr. Molella's treatment notes for that day unequivocally state that Schaub's "health has continued to decline. In his current state *we cannot provide* the skin cares and other skilled nursing support required to improve and manage his condition." (emphasis added). She, therefore, recommended that

---

that, absent an appeal or notice through any other means, VonWald did not know about the denial of Schaub's requests for treatment between July 17 and July 23.

Schaub not be returned to the ADC. This is the first time that Dr. Molella, or any other medical professional, unequivocally noted that the ADC medical staff could not adequately manage Schaub's needs through adaptive measures. Schaub's medical condition declined under Dr. Molella's "watchful waiting" approach, and his condition continued to decline after his release while he was under the care of private physicians. Three days after Schaub was released from the ADC, one of Schaub's private physicians noted that Schaub's sacral and ischial sores were at stages 1 (superficial) and 3, respectively. On August 15, the same doctor noted that Schaub's wounds had "worsened," and the record reflects that both these sores ultimately progressed to stage 4. Schaub also testified that he developed two additional pressure sores after he was released from the ADC on July 24.

Based on the above evidence, the district court held that VonWald–and VonWald alone–was deliberately indifferent to Schaub's objectively serious medical needs and held VonWald liable for $214,000 in lost wages and pain and suffering, and $750,000 in punitive damages, for a total of $964,000. To do so, the district court principally relied on VonWald's May 15 letter to Judge Williamson and the ADC medical staff's failure to bathe Schaub or change his dressings between July 17 and July 23. VonWald appeals, asserting that the record does not support Schaub's deliberate indifference claim or the $750,000 punitive award.

## II.    DISCUSSION

### A.    Deliberate Indifference–Eighth Amendment

Although the panel majority discounts the importance of context with regard to VonWald's May 15 letter to the sentencing court–that VonWald thought Schaub would remain on work release under the care of his own physicians–it claims for itself a pseudo context of facts and circumstances surrounding Schaub's return to full-time

confinement and ADC-directed medical care upon loss of his employment.[19] But, even applying this pseudo context, I find the panel's analysis substantially wanting.

The panel loosely weaves, evidence-wise, a tapestry adorned with factually and legally unsupportable breaches of duty and other transgressions by VonWald. Its panorama begins with VonWald becoming aware of Schaub's full-time return to the ADC on July 15. Although I do not disagree with the panel majority that Schaub had serious medical needs between July 15 and July 24–needs Dr. Molella documented during her July 17 evaluation–there is little evidence to support the idea that VonWald personally became aware of or had a duty to become aware of such needs. For all VonWald knew, Schaub was returning to the ADC's work release program on July 15 after seventy-six days of recuperating from a broken leg and one edema-induced pressure sore. Nevertheless, the district court and the panel majority contend that

_____

[19]The district court and the panel majority advance a confusing context, the elements of which neither factually nor substantively support the conclusion that VonWald recklessly disregarded Schaub's serious medical needs in violation of the Eighth Amendment. While the district court, in violation of well-established supervisory and respondeat superior precedent found reckless indifference extending from "July 17 until [Schaub's] release [from jail on July 24]," Trial Tr. vol. IV, 485 (Dec. 17, 2009), the district court also affirmatively found that the ADC habitation and care prior to the leg fracture on April 29 was not constitutionally deficient. Id. While Dr. Stolp outlined in her April 7 letter Schaub's somewhat precarious general health as a result of his long-standing paraplegia, neither Dr. Stolp nor any other witness identified any constitutionally defined "serious medical need" that Schaub presented to the ADC until Dr. Molella's evaluation on July 17. Thus, any attempt to morph VonWald's May 15 communication with the state sentencing judge–stating that the ADC could, as of that time, provide Schaub adequate medical care and habitation–into a July 17 duty to examine Schaub's medical records and to intercede with the sentencing judge, encounters a chasm of irrelevancy and immateriality. Indeed, the use of this judicially requested response (anchored as it was to an initial 57-day period of wholly constitutional habitation and care) as a building block that supports a finding of unconstitutional, scienter-laden acts by VonWald defies closely reasoned analysis.

VonWald had a duty, upon Schaub's return, to assume, as the Director of the ADC, immediate, personal, hands-on and continuing management of Schaub's medical treatment. For reasons outlined in more detail shortly, there is no precedent that supports the existence of such an Eighth Amendment duty based on the applicable facts and the ADC's routine course of operation.

Additionally, assuming that VonWald was or should have become aware of Dr. Molella's July 17 evaluation of Schaub's condition, which noted his new, outside-acquired wounds and frailties, there is no precedent that required VonWald–who had no reason to believe the highly trained ADC medical staff would fail or was failing to treat Schaub–to pierce at least two levels of established subordinate supervision, Captain Sinner and Dr. Molella, to personally examine this particular prisoner's medical records and to then assume supervision management and responsibility for Schaub's serious medical needs. Even if, in the course of events, VonWald was negligent, or even grossly negligent, in carrying out his duties (which of course he was not) there is no Supreme Court or other federal court precedent that imposes such a constitutional requirement.

To prevail on his Eighth Amendment deliberate indifference claim, Schaub bears the burden of proving that VonWald's mental state was "akin to criminal recklessness: disregarding a known risk to the inmate's health." Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir. 2009) (quotation omitted). This rigorous standard is "greater than gross negligence" and VonWald may not be held liable unless he (1) recognized the existence of a substantial risk of harm to Schaub's health; and (2) knew that his conduct was "inappropriate in light of that risk." Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009). But, supervisors such as VonWald cannot be held liable for an employee's unconstitutional actions under § 1983 on a theory of respondeat superior. Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995). "Rather, a supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate

-43-

indifference toward the violation." Id. Each step of the deliberate indifference inquiry is fact-intensive, and we review the district court's factual conclusions for clear error. Hartsfield v. Colburn, 491 F.3d 394, 397 (8th Cir. 2007). Under clear error review, we may reverse the district court if its decision is not supported by substantial evidence, was based on an erroneous view of the law, or we are left with a firm conviction that a mistake has been made after reviewing the entire record. United States v. Fazio, 487 F.3d 646, 657 (8th Cir. 2007).

After reviewing the entire record, there is clearly a dearth of evidence regarding what VonWald knew, or was directly responsible for knowing, about Schaub's medical needs during the period at issue–July 17 through July 24. As earlier noted, Schaub conceded at trial that he never (1) made any appeals to VonWald; (2) had any personal contact with VonWald during his confinement at the ADC; (3) requested special bedding accommodations beyond those provided by the ADC medical staff; or (4) requested to see a doctor between July 17 and July 24. Moreover, the evidence presented at trial shows that the ADC medical staff contacted VonWald just one time regarding Schaub's medical treatment between July 17 and July 24. On that occasion, VonWald approved Nurse Crandall's request for an outside agency to have access to Schaub. Simply put, between July 17 and July 24, there is no evidence that anyone notified VonWald that Schaub's bedding and wound-care needs were not being met–not Dr. Molella, not the ADC medical staff, not the ADC deputies, and not even Schaub. Absent such notice, there is certainly no basis for requiring the ADC director to essentially become a working member of the jail's medical unit.

Despite the lack of evidence regarding VonWald's knowledge of Schaub's medical needs between July 17 and July 24, the panel majority charges VonWald with notice of such needs because (1) VonWald reviewed Dr. Stolp's April 7 letter; and (2) VonWald failed to make any inquires into Schaub's medical treatment between July 17 and July 24. Under established precedent, these facts are grossly insufficient to

bridge the gap between the lack of evidence regarding VonWald's knowledge and the rigorous "greater than gross negligence" standard.

It is not clear how Dr. Stolp's April 7 letter, written at a time when Schaub had one pressure sore, gave VonWald notice that Schaub would return to the ADC on July 15 with four pressure sores and a developing area of pressure on his sacral region. Similarly, it is not clear how Dr. Stolp's letter, written at a time when Schaub did not have access to the ADC medical staff and had not yet been provided with adaptive bedding accommodations, gave VonWald notice that the ADC medical staff could not meet Schaub's needs. Indeed, it was not until July 24 that Dr. Molella even became certain that the ADC medical staff could not meet Schaub's needs through adaptive measures and, at that point, she took the steps necessary to ensure that Schaub received treatment elsewhere. If it was not until July 24 that Dr. Molella, a Mayo Clinic physician, became certain that the ADC medical staff could not meet Schaub's needs through adaptive measures, it is not clear how VonWald, a non-medical prison official who had no contact with Schaub, could or should have known such information before that time. "Th[e] [scienter] element of deliberate indifference must be viewed from [VonWald's] perspective *at the time in question*, not with hindsight's perfect vision." Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998) (emphasis added).

Also, in assuming that Dr. Stolp's April 7 letter sets forth the "required" course of treatment for Schaub between July 17 and July 24, the district court and the panel majority, without supporting medical evidence, improperly assume that the ADC medical staff's plan to meet Schaub's needs through adaptive measures was inappropriate under the circumstances. Ante at 12-13. While providing Schaub a pressure-relieving mattress may have represented the optimal course of treatment,[20]

_____

[20]Schaub testified at trial that, before he was confined at the ADC, his home bed had "a regular mattress on it." Thus, even if Schaub had carried out the remainder of his sentence on electronic home monitoring, there is no indication that he would have

-45-

inmates are only entitled to "adequate medical care," not the best care possible. Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006) (quotation omitted). Indeed, the Eighth Amendment does not require prisoners to receive "unqualified access to health care," Hudson v. McMillian, 503 U.S. 1, 9 (1992), and "prison doctors remain free to exercise their independent medical judgment." Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997). While Dr. Stolp advocated a pressure-relieving mattress on April 7, Dr. Molella was not certain as of July 17 that a pressure-relieving mattress was the *only* way to adequately meet Schaub's medical needs.[21] This is significant because prison officials "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. . . . [And,] a showing of deliberate indifference . . . requires more than mere disagreement with treatment decisions." Krout, 583 F.3d at 567 (quotations omitted). Under these circumstances, VonWald reasonably relied on the ADC's professional medical staff to accommodate Schaub.

In an unconvincing attempt to impute the ADC medical staff's duties and knowledge of Schaub's condition between July 17 and July 24 to VonWald, the panel majority asserts that "any inquiry into Schaub's treatment (or an examination of his medical file) would have revealed that his treatment was entirely insufficient." Ante at 16. This argument ignores the fact that, as discussed above, Schaub never made any appeals to VonWald and the ADC medical staff never told VonWald that Schaub's care, despite the implementation of an adaptive plan, was inadequate. The panel majority's notion that–absent a reason to believe (or actual knowledge) that the ADC medical staff was mistreating Schaub–VonWald had a legal duty to personally

_____

slept on a pressure-relieving mattress.

[21]Notably, Nurse Crandall, who provided Schaub with two mattresses, foam wedges and a sheepskin, opined at trial that she "provide[d] [Schaub] with what he needed" between July 17 and July 24.

-46-

supervise Schaub's treatment between July 17 and July 24 ignores the division of labor present within correctional facilities.

> If a prisoner is under the care of medical experts ([Dr. Molella] in this case), a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. . . . [A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official like [VonWald] will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004); see also Johnson, 433 F.3d at 1010 n.9. Surely, it was reasonable for VonWald, a non-medical prison official, to rely on a Mayo Clinic physician and the nurses she supervised to (1) meet Schaub's needs, and (2) notify him if such needs were not being met through adaptive measures between July 17 and July 24.

The panel majority cites Langford v. Norris, 614 F.3d 445 (8th Cir. 2010), to support its contention that VonWald had a duty to personally follow up with the ADC medical staff to determine whether Schaub's needs were in fact being met. But, Langford imposes no such duty under the facts of this case. Langford simply explains that "*if* [a supervisor] knew that [an inmate's] serious medical needs were not being adequately treated yet remained indifferent, he may be held personally liable." Id. at 460-61 (emphasis added). Here, unlike the supervisor in Langford, VonWald did not receive notice from Schaub (or anyone else) that the ADC medical staff was failing to meet Schaub's needs between July 17 and July 24. Cf. id. at 460-62 (holding that a supervisor who received inmates' "complaints about receiving deficient medical

care" could be liable for his failure to ensure that the inmates received adequate treatment).

Similarly, under the circumstances presented in this case, VonWald may not be held liable under a "failure to supervise" theory of liability. In Parrish v. Ball, 594 F.3d 993, 1002 (8th Cir. 2010), we explained that to succeed on a "failure to supervise" theory under § 1983, the plaintiff must show that the supervisor: "(1) *[r]eceived notice of a pattern of unconstitutional acts committed by subordinates*; (2) [d]emonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) [f]ailed to take sufficient remedial action; and (4) [t]hat such failure proximately caused injury to [the plaintiff]." (emphasis added) (quotation omitted). Needless to say, there is no evidence that VonWald had any reason to believe the nursing staff would fail to bathe Schaub, change his dressings, or reposition him in bed. The panel majority recognizes that such treatment was "well within the ken of the nursing staff," ante at 19, yet the majority faults VonWald for assuming, without follow-up, that the nursing staff would provide such care. In doing so, the panel ignores the fact that VonWald was entitled to rely on the ADC medical staff's professional training and ethical obligations to treat Schaub. Spruill, 372 F.3d at 236; cf. Connick v. Thompson, 131 S. Ct. 1350, 1363 (2011) (holding in the official liability context that a district attorney had no duty to train his prosecutors regarding the constitutional obligation at issue because "[a] district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations"). To be sure, VonWald knew that the nursing staff could not provide Schaub with a pressure-relieving mattress but the panel majority concedes "the (non)provision of a pressure mattress was not the *sine qua non* of the Eighth Amendment violation found by the district court." Ante at 14 n.5.

The panel's requirements do not end there. Because, according to the majority, VonWald was untruthful with the sentencing judge about the quantity and quality of

the ADC's medical capabilities and because he had the duty as director to become immediately aware of Schaub's serious medical needs, VonWald, not Schaub or his lawyer, had a duty to intercede sua sponte with Judge Williamson in support of Schaub being immediately placed on electronic-monitored home detention. Breach of the above-outlined duties, says the district court and the panel, constituted reckless indifference in violation of the Eighth Amendment. I very respectfully believe that this constitutes imagination unchecked. See, e.g., Michigan v. Bryant, 131 S. Ct. 1143, 1172 (2011) (Scalia, J., dissenting).

I also disagree with the panel majority's conclusion that expert causation testimony was not required in this case because "VonWald's deliberate indifference clearly exacerbated Schaub's wounds." Ante at 22. "When an injury is sophisticated, proof of causation generally must be established by expert testimony." Robinson v. Hager, 292 F.3d 560, 564 (8th Cir. 2002). Here, Schaub's failure to present any expert causation testimony is fatal to his claim because he clearly suffered from a sophisticated medical condition. Indeed, Dr. Molella testified at trial, without refutation by Schaub, that Schaub had "very complicated health needs." Although the panel majority attempts to simplify Schaub's condition, causation in this case was simply not within the realm of lay understanding. Id.

The total absence of any medical expert causation evidence makes it impossible to determine the extent of VonWald's damages liability, if any, for acts occurring between July 17 and July 24. And, the district court and the majority find no reckless indifference at any other time period. To be sure, the "eggshell skull" rule–i.e., a tortfeasor takes his victim as he finds him–applies to a § 1983 case. Gibson v. County of Washoe, 290 F.3d 1175, 1193 (9th Cir. 2002). However, the rule must not be applied in a way that obliterates the requirement that "[a] defendant may be held liable only for the damages that [he] actually causes." Limone v. United States, 579 F.3d 79, 108 (1st Cir. 2009). Indeed, notwithstanding the eggshell skull rule, a "defendant . . . is liable *only for the extent to which* the defendant's conduct has resulted in an

aggravation of the pre-existing condition, and not for the condition as it was." Gibson, 290 F.3d at 1193 (emphasis added) (quotation omitted).

A review of the district court's factual findings, the parties' stipulation of fact and other unrebutted portions of the record, highlights the evidentiary problems concerning causation. Without dispute, the first period of incarceration ended on April 29 when a fall at the ADC fractured Schaub's femur, resulting in a week's hospitalization. At that time, Schaub had one pressure sore on his left heel. The district court concluded that a deep thigh bruise resulted from Schaub's fall on April 29 and the bruise later developed "into an open pressure sore" on his ischial (lower buttock) region. Dr. Molella's July 17 evaluation indicated that Schaub returned to the ADC on July 15 with: (1) the previously undocumented 2.5 centimeter sore on his ischial region; (2) two (not one) separate ulcers on his left heel; (3) a new 2.5 centimeter sore on his right ankle bone; and (4) a new 4 x 5 centimeter area of pressure on his sacral region, which was appraised by Schaub's private physician on July 27 (three days after his discharge) as stage 1 (superficial). Moreover, at least two additional pressure sores developed after Schaub's final departure from the ADC. Against this evidentiary background, the district court and the panel majority assess damages against VonWald on the basis of Schaub's physical condition as it existed up to four years after he finally departed the ADC. This levy of damages includes the results of major surgery involving his fractured femur and the ischial region sore that developed from the thigh bruise that occurred at the time of the fracture. The district court specifically made no apportionment of physical damage that existed prior to July 17 or which was directly connected with the femur fracture of April 29 or incidents or medical care that occurred after July 24.

The only causation testimony in any way related to the four-year period was Schaub's testimony concerning his health prior to incarceration and his view of the

fateful eight-day period in July 2003.[22]  Otherwise, the majority relies upon records kept by the ADC medical staff and testimony from Dr. Molella and three nurses that prove, it claims, that Schaub's "wounds" were "exacerbated" between July 17 through July 24.  Exacerbated perhaps, but the record simply does not support the conclusion that this eight days of care was a sole proximate cause of every facet of damages Schaub allegedly incurred during the longer than four-year period at issue.  VonWald had no responsibility for Schaub's femur fracture, or the heel sore that initiated during his original fifty-seven day stay.[23]  Nor does the evidence support a finding that

_____

[22]The majority, in its footnotes 9 and 10, with little, if any, support from facts or foundation in the record, seeks to buttress its faulty causation conclusions by attempting to qualify plaintiff Schaub as his own medical causation expert.  This occurs when the panel credits Schaub's opinion that "the [ischial] infection had gotten so bad that it literally had eaten the whole femur head up."  Trial Tr. vol. III, 133 (Dec. 16, 2009).  The majority further compounds its evidentiary shortcomings as it endeavors to disassociate the femur fracture from the assessed damages.  The record does not permit it to do so.  Schaub himself testified that the sore on his right ischial region that ultimately damaged the femur head had its genesis in a bruise that occurred during the femur fall.  Id. at 173.  The sore actually developed while Schaub was absent from the ADC as was first noted by Dr. Molella on July 17 after Schaub's July 15 return.  The record then establishes that this sore markedly deteriorated after Schaub's July 24 discharge from the ADC, ultimately developing into an infection damaging the femur head, which infection began nearly five years _after_ Schaub's ADC discharge.  Id. at 131-32.  A substantial amount of the pain and suffering evidence adduced through Schaub's testimony involved the femur head infection and its treatment, id. at 129-33, and, there is no indication that the district court did not take such evidence into account in its damages award.  But, the causal relationship between his July treatment at the ADC and his later medical problems, especially the femur head problem, is unknowable without expert medical testimony.

[23]There is at least some indication that before April 29, Schaub may have exacerbated the pressure sore on his heel by failing to get additional bandages from his private physician to dress the wound.  Dr. Stolp's April 7 letter states that she gave Schaub "some tape and Cutinova foam" to dress the sore, and Schaub testified at trial that he changed the bandages on the sore at home while he was on work release.  However, Schaub's medical records state that when Schaub was admitted to the

VonWald was responsible for the additional pressure sores Schaub brought along on July 15, or the surgery that developed from the leg fracture or the care that occurred while the two sores developed after July 24.[24]

The panel majority cites Parrish, 594 F.3d 993, and Ricketts v. City of Columbia, 36 F.3d 775 (8th Cir. 1994), as precedent for its unsupported conclusion that VonWald's deliberate indifference clearly caused Schaub's damages. Neither case supports the panel majority's position that specific causation evidence is not necessary in a case such as this. Indeed, both Parrish and Ricketts say only that if in a particular case relevant evidence of causation makes the issue "free from doubt," the court may find causation as a matter of law, nothing more. Parrish, 594 F.3d at 1000 (quotation omitted); Ricketts, 36 F.3d at 779-80 (quotation omitted). Certainly, a finding of deliberate indifference does not come with self-executing proof of causation attached.

With the naked statement that the care Schaub received from July 17 through July 24, "exacerbated Schaub's wounds," ante at 22, the panel affirms the global damages imposed by the district court based upon an undifferentiated evaluation of Schaub's entire health travails extending from March 4, 2003, until at least four years later. Ante at 9. Without expert testimony, there is simply failure of proof. See Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006) (holding that expert causation testimony was required to show that allegedly deficient treatment plan caused claimant's foot infection and subsequent amputation where the claimant's medical condition predisposed him to injuries of this nature and the foot wound worsened under claimant's own care).

hospital on April 29, the sore on Schaub's heel "[wa]s not healing," due, in part, "to no available dressings." The record states that "[Schaub] was restarted on Cutinova foam" to treat the sore.

[24]Dr. Molella testified that Schaub's deterioration at the ADC between July 17 and July 24 was not "marked deterioration." She verified, however, that Schaub suffered from "marked deterioration" *after* he left the ADC on July 24.

**B.      Punitive Damages**

Even if VonWald is somehow liable to Schaub for $214,000 in compensatory damages, the record simply does not support the district court's $750,000 punitive award.  Punitive damages are appropriate in a § 1983 action only where a defendant shows "reckless or callous indifference" to a federally protected right.  Smith v. Wade, 461 U.S. 30, 56 (1983).  If the district court finds that the defendant's conduct meets the callousness threshold, "the court should then consider the two purposes of punitive damages: (1) punish willful or malicious conduct; and (2) deter future unlawful conduct."  Royal v. Kautzky, 375 F.3d 720, 724 (8th Cir. 2004).  In other words, to award punitive damages in this case, "the district court was required to find *not only* that [VonWald's] conduct met the callousness threshold . . . *but also* that [his] conduct merited a punitive award . . . in addition to the compensatory award."  Coleman v. Rahija, 114 F.3d 778, 787 (8th Cir. 1997) (emphasis added).  Whether a defendant's conduct meets the callousness threshold is a question of fact, which we review for clear error, but the question of whether conduct merits a punitive award in addition to a compensatory award is a "moral judgment," which we review for an abuse of discretion.  Id.; Royal, 375 F.3d at 724.

Although the "deliberate indifference" and "callous indifference" standards are similar, "[a] finding of deliberate indifference to a serious medical need . . . does not necessitate a finding of callous indifference warranting punitive damages."  Coleman, 114 F.3d at 787.  VonWald's conduct in this case was clearly not sufficiently egregious to justify the imposition of punitive damages.  As discussed above, there is a dearth of evidence regarding what VonWald knew about Schaub's medical needs between July 17 and July 24, but there is evidence that VonWald relied on Dr. Molella and the ADC medical staff to treat Schaub through adaptive techniques.  See id. at 788 (holding that a registered nurse was not liable for punitive damages because she relied on, and attempted to follow, a physician's instructions).  Moreover, there is no evidence that VonWald acted with bad faith, evil motive, or ill intent, and the district

court expressly conceded as much. See id. at 787-88. In fact, VonWald had no personal contact with Schaub during Schaub's confinement at the ADC, and he approved what appears to be the only request brought to him by the ADC medical staff between July 15 and July 24–Nurse Crandall's request for home health care nurses to have access to Schaub.

To affirm the district court's conclusion that VonWald's conduct meets the callousness threshold, the panel majority emphasizes that VonWald assured Judge Williamson that Schaub could bring in whatever mattresses he thought he needed, even though VonWald knew a fire code barred pressure-relieving mattresses in the ADC. The panel majority's reliance on this exchange between Judge Williamson and VonWald is extremely problematic because, as discussed above, it took place long before VonWald could have known that Schaub would return to the ADC with four pressure sores instead of one, and before VonWald could have known that Schaub would lose his work release privileges and be under the care of the ADC medical staff. Also, it is significant that the ADC medical staff later provided Schaub with adaptive bedding accommodations, even if in hindsight such accommodations proved to be insufficient. Schaub conceded at trial that he never requested special bedding accommodations beyond those provided by the ADC medical staff between July 15 and July 24. Simply put, the heavy emphasis the panel majority places on VonWald's letter to Judge Williamson stretches the letter far beyond its contextual limits.

Even assuming VonWald's conduct meets the callousness threshold, I would find that the district court abused its discretion in awarding Schaub $750,000 in punitive damages because the district court, contrary to Eighth Circuit precedent, wholly failed to consider whether the award advances the two underlying purposes of punitive damages: (1) to punish willful or malicious conduct; and (2) to deter further conduct. In § 1983 cases, punitive damages are the exception, not the rule, because "[§] 1983 *presupposes* that damages that compensate for actual harm *ordinarily suffice* to deter constitutional violations." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S.

-54-

299, 310 (1986) (emphasis added). Here, the district court levied the punitive award against VonWald, in addition to a $214,000 compensatory award, without making *any* findings regarding the need for additional deterrence or punishment. See Coleman, 114 F.3d at 787 (requiring district courts to conduct such an analysis). To be sure, the district court made findings of fact in an attempt to support its conclusion that VonWald's conduct met the callousness threshold, but the district court did not so much as mention "deterrence" or "punishment" in its oral decision or otherwise acknowledge its duty to consider such factors before imposing punitive damages. Cf. Royal, 375 F.3d at 725 (finding no abuse of discretion where the court accurately stated the standard governing punitive awards and made a determination regarding the need for deterrence and punishment).

The district court's error is significant because there is at least some evidence in the record to suggest that a $750,000 punitive award, in addition to the sizeable $214,000 compensatory award, was not necessary to further the goals of punishment or deterrence in this case. For example, the need for deterrence is arguably lessened by the fact that VonWald was no longer a jail administrator; he was appointed sheriff of Olmstead County approximately two years before trial. The majority's footnote 12, which duly notes that punitive awards *may* be used to deter others, misses the point.[25] Ante at 24-25 n.12. The district court's failure to discuss either deterrence or punishment in its oral decision leaves us guessing as to why or if the district court even decided that a punitive award was necessary in addition to $214,000 in

---

[25]While imagining how the district court *could have* analyzed the goals of deterrence and punishment in this case, the panel hypothesizes that "[o]ther prison administrators should be deterred from making a false response to a direct judicial inquiry." Ante at 24-25 n.12. Of course, it would be proper for the district court to consider this factor *on remand* while conducting its own deterrence/punishment analysis. And, while conducting such analysis, it would also be proper for the court to consider other deterrents already in place that may dissuade other administrators from making false responses to state court judges, such as the possibility of facing perjury charges.

compensatory damages to achieve the goals of deterrence and punishment. Rather than vacating the award and remanding for findings of fact, the majority attempts to support the district court's punitive award by making its own findings of fact and conducting its own analysis regarding the need for additional deterrence and punishment. This, as an appellate court, we cannot do. See Duffie v. Deere & Co., 111 F.3d 70, 74 (8th Cir. 1997).

It is also troubling that there is no evidence in the record regarding VonWald's ability to pay the $750,000 punitive award. As the court in Hollins v. Powell, 773 F.2d 191 (8th Cir. 1985) explained while reviewing a punitive award in a § 1983 case: "We can see neither the justice nor sense in affirming a verdict which cannot possibly be satisfied. The purpose of punitive damages is to punish [the wrongdoer] for outrageous conduct, not to drain him of his life's blood." Id. at 198; see also City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 269 (1981) (acknowledging that punitive damages may be awarded "in appropriate circumstances against the offending official, based on his personal financial resources"); Eighth Circuit Model Jury Instruction 4.50C (instructing that, in a civil rights case, the jury should consider the defendant's financial condition to determine what amount of punitive damages is needed to punish the defendant and deter him and others in the future). "The principle that a punitive award must be considered in light of the defendant's financial condition is ancient[,]" dating back to the Magna Carta nearly 800 years ago. Adams v. Murakami, 813 P.2d 1348, 1352-53 (Cal. 1991). It is not surprising, then, that our court applied Hollins in Bredberg v. Long, 778 F.2d 1285, 1290 (8th Cir. 1985) to set aside a punitive award where no evidence was presented regarding the financial status of individual defendants. This case demands the same result, and I would set aside the $750,000 punitive award because there is no evidence regarding VonWald's financial status.

The panel majority emphasizes that in Grabinski v. Blue Springs Ford Sales, Inc., 136 F.3d 565, 570-71 (8th Cir. 1998), a panel of this court held that the burden

is on defendants to show that their financial circumstances warrant a limitation of punitive awards, and their failure to produce such evidence constitutes waiver. To the extent that Grabinski applies in this context–i.e., to the award of punitive damages in a § 1983 case following a bench trial–I think Grabinski is at odds with Hollins and Bredberg. "When we are confronted with conflicting circuit precedent, the better practice normally is to follow the earliest opinion, as it should have controlled the subsequent panels that created the conflict." T.L. ex rel. Ingram v. United States, 443 F.3d 956, 960 (8th Cir. 2006). I would apply Hollins and Bredberg in this case because they were decided well before Grabinski and because they represent the better approach, especially in the § 1983 context. As discussed above, § 1983 *presupposes* that compensatory damages act as a sufficient deterrent of constitutional violations. It seems only logical, then, that it is the plaintiff's burden to rebut this presumption by producing evidence, including evidence regarding the defendant's financial means, that an additional punitive award is necessary to deter or punish the defendant or others. Without any evidence regarding the financial status of VonWald, or any findings of fact regarding the need for further deterrence or punishment, it is simply impossible to determine whether the $750,000 punitive award operates as an effective deterrent or effectively drains VonWald of his life's blood. I can see "no reason why a modern-day civil defendant should be entitled to less consideration than one was given 800 years ago." Murakami, 813 P.2d at 1353.[26]

---

[26]Although not raised by VonWald, I think the 3.5-to-1 punitive-to-compensatory damages ratio in this case approaches the outer limits of the due process guarantee. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003) (articulating "guideposts" for reviewing the constitutionality of punitive awards). "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Id. at 419 (alteration in original) (quotation omitted). Here, the degree of reprehensibility is low because, as discussed above, VonWald reasonably relied on the ADC medical staff to treat Schaub. And, while a punitive-to-compensatory damages ratio of 4-to-1 has been upheld by the Supreme Court in the past, the Court has cautioned that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to

## III.  CONCLUSION

It is unfortunate that Schaub, a paraplegic, arrived at the ADC with several difficult and precarious physical conditions, including a predisposition to pressure sores, as outlined by Dr. Stolp in her April 7 letter.  It is unfortunate that Schaub fell and fractured his femur and bruised his ischial area, later resulting in major surgery and permanent disability.  It is unfortunate that the medical treatment he received during his various hospital visits and at his home under the supervision of his own physicians did not succeed in treating his complex medical problems.  But none of these things resulted from constitutionally sufficient breaches of duty by Director VonWald.

The district court seems to have found that Judge Williamson largely denied Schaub electronically monitored home detention at the May modification proceeding because VonWald failed to inform Judge Williamson that pressure-relieving mattresses were barred at the ADC.  Even with the attachment of Dr. Stolp's letter and VonWald's communication to the denial order, there is almost no evidence that the sentencing judge's order was substantially based upon this omission or any other falsehood uttered by VonWald.  Thus, the district court's factual finding fails as a matter of law.  The panel majority admits such a result when it concedes that the failure to provide a pressure-relieving mattress "was not the *sine qua non* of the Eighth Amendment violation."  Ante at 14 n.5.

---

compensatory damages, can reach the outermost limit of the due process guarantee." Id. at 425.  Finally, the district court did not consider the purposes underlying punitive damages before it issued the $750,000 punitive award in this case.  Id. at 419 ("[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.").   Under these circumstances, it appears that the punitive award in this case was impermissibly based on the district court's caprice, not the application of law.  See id. at 418.

To buttress its affirmance of the district court's $964,000 in money judgments, the majority embellishes and defines the extant circumstances and imposes newly minted, but unsupportable, duties upon VonWald, the breach of which, it claims, support a finding of reckless indifference to Schaub's serious medical needs. These duties evolve as follows:

> VonWald was cognizant of the circumstances of the May sentence-modification hearing and of his failure to properly apprise Judge Williamson concerning pressure-relieving mattresses. With this knowledge and the further knowledge that Schaub had returned to full custody on July 15, VonWald had a duty to immediately examine Schaub's ADC medical records. And, if done, the records would have revealed Dr. Molella's examination of July 17, which, in turn, would have revealed that Schaub had serious medical needs which presented a congruent need for immediate and proper treatment. With this knowledge, VonWald then had a duty to personally ensure that the highly trained ADC medical staff provided Schaub with routine medical care–baths, dressing changes, and body repositioning.

Even if VonWald had carried out these newly crafted duties, however, there is no evidence that Schaub's claimed damages would have been averted.

The panel majority essentially concedes that VonWald did not actually know of Schaub's serious medical needs as they existed between July 17 and 24. And there is no dispute that Schaub's medical records during that period, if examined, would have revealed such needs. But, the records would also have revealed Dr. Molella's "watchful waiting" treatment plan, which employed special bedding and other accommodations recommended by the ADC medical unit. They would have also revealed that Dr. Molella expressed no urgency or inclination to immediately remove Schaub to a hospital setting or to his home when she first evaluated him on July 17 or, indeed, until July 24. Should VonWald have seen fit to overrule and disregard this Mayo-Clinic-trained physician's "watchful waiting" decision, and on his own motion

-59-

intercede for Schaub with the sentencing court in favor of a home-detention-sentence modification as suggested by the panel, it is doubtful that a sentence modification would have been issued before July 24. Indeed, VonWald would have surely been obligated to give notice to the state prosecutor, especially since the prosecutor had earlier opposed home detention. The prosecutor, in turn, would have likely been entitled to time to investigate the basis for VonWald's motion and to respond to the court within a reasonable time. Under these circumstances, it is more likely than not that such a sentence modification procedure would have been pretermitted by Dr. Molella's decision to hospitalize Schaub on July 24.[27]

Thus, the panel majority finds $964,000 in money judgments levied against VonWald based on actions and events over which he had no reasonable control, even if he followed the panel majority's unprecedented requirements to the letter.

From this result, I dissent.

_____

[27]Indeed, even after Dr. Molella unequivocally noted that the ADC could not accommodate Schaub on July 24, Schaub's jail sentence was not vacated until July 28, some four days later.